**Veronica NERI, Petitioner,**

v.

**Tina HORNBEAK, Warden, Respondent.**

**No. EDCV 07–1229–FMC (RNB).**

United States District Court, C.D. California.

May 2, 2008.

Veronica Alejandro Neri, Chowchilla, CA, pro se.

Douglas P. Danzig, CAAG Office of Attorney General of California, San Diego, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

FLORENCE–MARIE COOPER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the pleadings and papers herein, including the Magistrate Judge's Report and Recommendation. Objections to the Report and Recommendation have been filed by respondent. Having made a *de novo* determination of those portions of the Report and Recommendation to which objections have been made, the Court concurs with and adopts the findings, conclusions, and recommendations of the Magistrate Judge.

IT THEREFORE IS ORDERED that Judgment be entered granting a conditional writ of habeas corpus as follows: Unless petitioner is brought to retrial within sixty (60) days of the date the Judgment herein becomes final (plus any additional delay authorized under State law), respondent shall discharge petitioner from all adverse consequences of her conviction in San Bernardino County Superior Court Case No. FVA015633.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order and the Judgment by United States mail on petitioner and counsel for respondent.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Florence–Marie Cooper, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On September 25, 2007, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody herein. In accordance with the Court's Order Requiring Response to Petition and following two extensions of time, respondent filed an Answer to Petition, along with a supporting Memorandum of Points and Authorities ("Ans.Mem.") on December 28, 2007. Petitioner did not file a Reply or seek an extension of time to do so.

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that the Petition be granted.

## PROCEDURAL HISTORY

On May 7, 2004, a San Bernardino County Superior Court jury found petitioner guilty of second degree murder and assault on a child under eight years of age causing death. (*See* 2 Clerk's Transcript on Appeal ["CT"] 397–98; 4 Reporter's Transcript on Appeal ["RT"] 905–06). On November 18, 2004, the trial court sentenced petitioner to state prison for an indeterminate term of 25 years to life. (*See* 2 CT 437; 4 RT 948).

Petitioner appealed her conviction and sentence to the California Court of Appeal raising claims corresponding to both of the Grounds raised in the Petition herein. Concurrently therewith, petitioner filed a petition for writ of habeas corpus raising an unrelated ineffective assistance of counsel claim based on *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), along with a claim generally corresponding to Ground Two of the Petition herein. (*See* Respondent's Notice of Lodgment ["Lodgment"] Nos. 3, 6). In an unpublished decision filed on June 16, 2006, the California Court of Appeal rejected all of the claims raised on direct appeal and on habeas and affirmed the judgment. (*See* Respondent's Notice of Lodgment ["Lodgment"] Nos. 3). Petitioner's ensuing Petition for Review to the California Supreme Court raising all of the claims raised in the Court of Appeal was denied on August 30, 2006, without comment or citation of authority. (*See* Lodgment Nos. 8, 9).

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

The following summary is taken from the "Facts" section of the California Court of Appeal opinion (*see* Lodgment No. 7 at 3–6):

In August of 2001, [petitioner] had two children, Dana, who was 16 months old, and Maxwell, who was two years four months old. [Petitioner] lived in a one-bedroom apartment with her boyfriend, Noe Lugo, her two children, Noe's parents and sister, Lucy. [Petitioner] had met Noe at night school, where both were taking classes to learn English. Apparently, at the time, [petitioner] was still married to Samuel Santiago. [¶] On the morning of August 13, 2001, Noe, who worked in the evenings, came home and noticed that Dana appeared to be sad. As usual, Noe went to sleep during the day. Later in the morning, while [petitioner] was taking a shower, Noe woke and heard Dana moaning.[1] He noticed that Dana was having difficulty breathing. Noe knocked on the bathroom door and told [petitioner] that her daughter was sick. Dana became unconscious and [petitioner] attempted to give her mouth-to-mouth resuscitation. After telling Noe to call the ambulance, [petitioner] instead decided to drive Dana to the hospital. [¶] En route to the hospital, [petitioner] noticed an ambulance and flagged it down. The ambulance was occupied, but the emergency personnel called for another ambulance. [¶] Shortly after arriving at the hospital, the doctors announced that Dana was dead. The autopsy report indicated that Dana's injuries were not accidental. Dr. Steven Trenkle, who performed the autopsy, noted acute fractures to Dana's right fourth, fifth, sixth, and seventh ribs. He also noted that Dana had healing fractures of certain front and posterior ribs. Dana's pancreas was completely torn, which likely occurred three to five days before her death. Her recent injuries and death were caused by tears to the liver, diaphragm, the mesentery of the bowel, right adrenal gland, and

---

1. The evidence at trial actually established that Noe awoke to hear Dana moaning late in the evening on August 13, 2001, sometime between 9:00 and 10:00 p.m., not "in the morning." (*See* 2 CT 532; 2 RT 516–18).

pancreas. Dr. Trenkle noticed that Dana had bled the majority of her blood volume into her abdominal cavity. The injuries were caused by a considerable amount of force, which could not have been inflicted accidentally or by a small child. The amount of force required would have been equivalent to a hard punch or a kick. [¶] Although there were other adults in the home, [petitioner] was the children's primary caregiver. She was the only one who disciplined the children. She sometimes slapped her children on the mouth and hands and spanked their buttocks. During her police interview, [petitioner] explained that Dana was very clingy that morning and insisted on staying by her side. [Petitioner] pushed her away. When Dana refused to go to sleep, [petitioner] grabbed her by the hand, lifted her, and tossed her on her pillow. She landed on a plastic cup, which was on the bed. [Petitioner] denied hitting or kicking Dana in the stomach or having any intent to kill her daughter. [¶] [Petitioner] claimed that Noe was responsible for Dana's injuries.

## PETITIONER'S CLAIMS

1. Petitioner's statements to Detective Ortiz were the product of an unlawful detention and were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 444, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (*See* Pet. 12–15; Pet. Memorandum of Points and Authorities ["Pet. Mem."] at 12–32).[2]

2. Requiring petitioner to sign a declaration during trial, and seizing and allowing the prosecutor to cross-examine petitioner about a marked-up draft of the declaration denied petitioner her rights to silence, to counsel, to a fair trial, and to freedom from unreasonable seizures; and trial counsel rendered ineffective assis-

tance with respect to the declarations. (*See* Pet. at 9–11, 16–18; Pet. Mem. at 33–62).

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); *Smith v. Patrick*, 508 F.3d 1256, 1260 (9th Cir.2007).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have

---

**2.** The Court has sequentially numbered the handwritten pages appearing after page 8 of the habeas form. In addition, petitioner has submitted as a Memorandum of Points and

Authorities a copy of the relevant pages of her opening brief on appeal, starting with page 12 thereof.

distinct meanings. *See Williams,* 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early,* 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.,* the rejected decision may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d

279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti,* 537 U.S. at 24–27, 123 S.Ct. 357; *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Visciotti,* 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

## DISCUSSION

**A. *Habeas relief is not warranted with respect to petitioner's claims based on the admission of statements allegedly resulting from an unlawful detention and Miranda violations.***

1. *The proceedings in the State courts*

a. *petitioner's motion to suppress*

Prior to trial, petitioner's counsel filed a motion to suppress *inter alia* the statements she made to Detective Ortiz on the grounds that they were the result of an "unlawful de facto arrest" in violation of the Fourth Amendment and a custodial interrogation without a valid *Miranda* waiver in violation of the Fifth Amendment. Petitioner further argued that her statements were involuntary under the Fourteenth Amendment. (*See* 1 CT 57–81).[3] The prosecution filed an opposition to the motion. (*See* 1 CT 90–97). Following the filing of the opposition, defense counsel filed a declaration under petitioner's name on June 16, 2003.[4] Therein, petitioner stated in pertinent part:

---

3. Petitioner made additional arguments regarding the inadmissibility of certain physical evidence, but later abandoned those arguments. (*See* 1 RT 21).

4. As is explained at great length *infra,* the declaration was not executed by petitioner at

the time the motion was filed due to defense counsel's oversight. Only after extensive proceedings held during trial did petitioner sign a modified version of the declaration. None of the modifications made to the original declaration affected the portions of the declaration quoted herein.

"At about 7:00 a.m., the first Spanish speaking police officer—a female officer named Detective Mary Ortiz arrived at Arrowhead Regional Medical Center. Detective Ortiz approached me and I told her I wanted to go home. But, Detective Ortiz told me that I could not go home. Detective Ortiz told me I was going to be taken to the police station. [¶] Noe and I were then taken by police officers to a police car and driven to the police station by a female police officer, who did not speak Spanish. [¶] When Noe and I arrived at the police station, we were placed in a small room. A police officer was stationed at the door to the small room. I told the police officer I wanted to go home, but he did not speak Spanish. The police officer would not let us leave. [¶] Noe and I were kept in the small room at the police station all day long. According to the clock on the wall of the room, I was kept in this room from 8:30 AM until 6:00 PM. Whenever I got up to move around, the police officer would also get up. I asked to use the phone; but the police would not allow me to make any phone calls." (1 CT 110).

A "CAD" Operations Report also submitted by petitioner corroborated petitioner's claim that a police officer had been assigned to sit with her at the station. An entry on the log read: "[08/14/2001 08:45:54: BANDERSON] PER S1O FIND A RESERVE TO RESPOND TO 1019 TO SIT WITH THE POTENTIAL SUSPECTS." (*See* 1 CT 128).

Among the other evidence submitted in support of petitioner's motion was the Rialto Police Department "narrative report" of Detective Mary Ortiz. Therein, Ortiz stated that when she arrived at the hospital, "[she] then went to a waiting room and made contact with Vanessa Neri and Noe Lugo. [Ortiz] advised that [she] would be investigating the case and that [she] would need to talk to them at the police department. They both advised that they would go with [her], however, since officers had earlier towed their vehicle they were transported to the station by Ofcr. Day." (*See* 1 CT 127).

In support of its opposition to the suppression motion, the prosecution submitted a declaration attesting that another district attorney had interviewed Deputy Coroner Kinney, who was called to the hospital on the night Dana died. (*See* 1 CT 104–05). The declaration was apparently intended to rebut the argument that petitioner had been detained at the hospital, or was subject to a de facto arrest.[5] The prosecution did not submit any other declarations.

The videotape of Detective Ortiz's interview with petitioner (in Spanish), along with a transcript of the interview translated into English also was before the trial court. Around 3:50 p.m. the day after Dana's death, and after Detective Ortiz had attended Dana's autopsy (*see* 1 CT 91:7–10), she took petitioner from the police lounge to an interrogation room and began questioning her. Ortiz did not give petitioner *Miranda* warnings at the outset of the interview. Ortiz told petitioner that someone had beaten Dana, that she had died of "internal blows," and that her ribs were broken. (*See* 2 CT 480). Ortiz asked petitioner if she had gotten mad at Dana "yesterday." Petitioner denied kicking or hitting Dana. (*See* 2 CT 482–84). Shortly before 5:30 p.m. (*see* CT 91:16), Ortiz asked petitioner if she had thrown Dana to the floor or against a piece of furniture. Petitioner replied that when Dana would not to go sleep, she would get

---

5. At the hearing on the motion, however, defense counsel stated that petitioner had "voluntarily stayed for seven hours at the hospital." (*See* 1 RT 18). Petitioner is not now contending that she was in custody at the hospital.

mad, but she did not hit Dana. She told Dana to go to sleep and "would toss her to the pillow." Ortiz said, "[I]t's better that you explain what happened because it's one thing if you want to kill your little girl, but it's another if you got mad and did something that ... was an accident ... or because you were mad." Petitioner responded, "No, I didn't want to, I didn't want to kill her. I didn't want to kill her." (*See* 2 CT 490). Ortiz asked petitioner what she thought could have happened. Petitioner responded, "I don't think that, that if I, that I, from a, hit her or something, I don't think I broke her ribs." Petitioner explained that there was a plastic cup on the floor where Dana slept, and that she had thrown Dana on the pillow and laid down with her. Dana had landed face down. Ortiz suggested that petitioner might have thrown Dana down harder than she thought. When asked who else was in the room when petitioner threw Dana down, petitioner responded Maxwell and Noe, but Noe was asleep. At this point, Ortiz indicated she was going to step out of the room. Petitioner asked, "Do I stay here?" Ortiz replied, "Stay here." (*See* 2 CT 491).

While Ortiz was out of the room, petitioner twice told Detective Hector Santana, "I need to leave." She stated she was feeling frustrated inside. (*See* 2 CT 491–92). Santana informed Ortiz and when she came back into the interview room, she asked petitioner how she felt. There was an "inaudible response." Ortiz inquired, "Why? You don't feel well?" Petitioner responded, "Mmm hmm. I want to see my little boy (crying.) Will I be able to see him Friday?" (*See* 2 CT 492). Ortiz responded that she did not know because "we don't know what's happening here ... I have an idea of what, what happened with the little girl.... [I]t's not fair to blame someone else if they didn't do anything ... I have some questions that I want to ask you, but first I'm going to read you your rights." (*See* 2 CT 492–93).

Ortiz then read petitioner her *Miranda* rights. (*See* 2 CT 493). Ortiz then asked petitioner if she was willing to continue speaking with her. The transcript reads "15 seconds of silence." (*See* 2 CT 493). Ortiz asked petitioner to tell her again what had happened to the little girl the night before. Petitioner repeated that she bathed them, put pampers on them, gave them milk with "Quick" and put them to bed. Dana stood up twice when she was supposed to sleep, and petitioner grabbed her by the hand, picked her up, said "Go to bed," and threw her on the pillow, where she landed on the little cup. When Ortiz asked petitioner if she had kicked Dana, she replied, "No, I don't think so, no." (*See* 2 CT 494). Petitioner denied hitting Dana in the stomach. Ortiz commented that petitioner was not the first mother to get mad at her children and hit them without realizing the force she was using. Petitioner replied, "(Crying), but I didn't want to kill her or anything." (*See* 2 CT 495). She later said, "If I did something ... to my little girl I didn't do it with the intention of killing her." (*See* 2 CT 504). She again repeated that she grabbed Dana by the arm, lifted her up, and threw her on the pillow. (*See* 2 CT 505). Petitioner denied ever hitting Dana with a closed hand, and when asked whether she had ever hit Dana with her foot, petitioner responded, "Uh, but not hard, not hard, on the diaper." (*See* 2 CT 509). Ortiz told petitioner that she was going to be arrested. Petitioner asked, "I'm the only one going to jail?" Ortiz asked who else should go to jail. Petitioner responded, "I don't want to blame anyone, but I don't want to be responsible either (crying)." (*See* 2 CT 511). After some more questions, petitioner showed Ortiz how she had grabbed Dana by the arm and threw her to the pillow. She repeated that she had

laid down with Dana, and stated that Dana did not cry and fell asleep. (*See* 2 CT 517–18).

Petitioner was arrested around 7:00 p.m. (*See* 1 CT 91, 2 CT 510, 518–19).

### b. *The hearing on the suppression motion*

The trial court held a hearing on the suppression motion on June 18, 2003. (*See* 1 RT 9–26). At the hearing, the trial court indicated that it had reviewed the videotape of the interview of petitioner and read the English translation of the tape, and had read the points and authorities submitted by defense counsel, petitioner's declaration, the People's opposition to the motion, accompanied by the prosecutor's declaration, and petitioner's reply to the People's opposition. The court also had read case law submitted by petitioner. By stipulation of the parties, the trial court heard no live testimony. (*See* 1 RT 24–25). The court found that no unreasonable seizure in violation of the Fourth Amendment had occurred; that no Miranda violation had occurred; that there was no illegal arrest in violation of the Due Process Clause of the 14th Amendment; and that petitioner's statements were voluntary. The trial court reasoned in pertinent part:

> "[U]nder the legal sense of compulsion, the [petitioner] and her boyfriend were not compelled to go to the police station in Rialto. They accepted a ride, if I may use that term, because the car in which they had gone to the hospital had been impounded for other reasons. They didn't have a way to get to the Rialto Police Department otherwise. [¶] I have viewed the videotape ... This is a woman who is distraught. She was upset. She had just lost her daughter. She was in unfamiliar settings and surroundings. She was having to deal—unless Deputy Ortiz was there, Officer Ortiz, she was having to deal with people who did not speak her language. [¶] All

of that together, none of that means that she was being illegally detained or that she was in custody under the 4th Amendment sense of custodial interrogation or 5th Amendment *Miranda* sense of custodial interrogation. [¶] At most, at most, the most that can be said is that at the point during the interview where she said, 'I need to go home now,' or 'I need to go back to my son,' that perhaps at that point this became a Terry Stop or a Terry Investigation. I'm not sure that I can go that far but I won't go any further than that." (1 RT 14–15).

The trial court indicated that it had made the parties "aware of the Court's thinking" and would entertain further argument. During argument, defense counsel characterized Detective Ortiz's initial statement to petitioner as "I need to talk to you at the police station." The trial court apparently agreed, or at least acquiesced in defense counsel's characterization. (*See* 1 RT 18). Defense counsel argued that "a 21–year–old Spanish-speaking girl whose baby has just passed away, she is supposed to say, I know I can leave? That—I don't even have a car." The trial court responded that "the fact that she didn't have a car didn't have anything to do with law enforcement having to do with this case. That car was impounded for other reasons." (*See* 1 RT 18–19). Defense counsel agreed, but maintained that it was relevant to determine whether she went to the police station voluntarily "in the back seat of a police car." The trial court found it "very clear that [once there] she was in the front lounge at the police department." (*See* 1 RT 20). Defense counsel argued that "it is also very clear they called in an officer just to guard her, who sat with her from 7:00 a.m. until 6:00 p.m.—or at least 3:00 p.m., according to Detective Mary Ortiz," and that the guard did not speak Spanish. Citing *Kaupp v.*

*Texas,* 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), the trial court indicated that with respect to the Fourth and Fourteenth Amendment arguments, "you almost have to get to a *Kaupp* case before you find it in violation of the Constitution." [6] (*See* 1 RT 22). The trial court explained that with respect to the interview, it "found that interview for the most part to be very voluntary. She is very distraught. She is very upset" but it was not compelled testimony. (*See* 1 RT 23).

### c. *The California Court of Appeal opinion*

On direct appeal, petitioner claimed that she was unlawfully detained from the time she was taken to the police station through and including her interview by Detective Ortiz; that *Miranda* advisements should have been given at the beginning of the interview with Detective Ortiz; that Detective Ortiz did not "scrupulously honor" petitioner's request to terminate the interview; that the failure to terminate the interview vitiated the *Miranda* waiver obtained immediately thereafter; and that she was prejudiced by the admission at trial of her statements to Detective Ortiz. In rejecting petitioner's claim, the California Court of Appeal reasoned in pertinent part as follows [7] (*see* Lodgment No. 7 at 4–14):

*Initial Encounter at [ . . .] [the] Police Station*

*[A]s found by the court, [petitioner] and Noe willingly accompanied Detective Ortiz to the police station. Ortiz explained: 'They advised that they*

*wanted to speak to me. They wanted to find out what happened to Dana, and that they would be willing to come on their own; however, they had no ride. [¶] So I provided a ride with another police officer to transport [Noe] and [petitioner] to the police department.' At this point, the investigation had not focused on [petitioner]. Ortiz asked [petitioner], Noe, and Lucy to accompany her to the station. As Ortiz explained, all three went to the station of their own accord. Because [petitioner] willingly accompanied Ortiz to the station, [petitioner's] presence at the station was not the result of a detention.*

*At the station, [petitioner] was not detained during the initial questioning. 'The Fourth Amendment does not prevent a person from agreeing to accompany officers to the police station and remain there for interrogation.' [Citations omitted]. Even a long delay, as involved here, does not transform the consensual encounter to a detention where there is no evidence of any use or show of authority to restrict the individual's liberty. [Citation omitted].*

*Here, [petitioner] and Noe waited for several hours as Detective Ortiz questioned Lucy and then attended the autopsy to determine the cause of Dana's death. During that time, [petitioner] and Noe sat in the front lounge with a non-Spanish speaking officer, who was assigned to sit with them. In her declaration, [petitioner] stated that she had told the officer that she wanted to*

---

**6.** The trial court had earlier described *Kaupp* as "somebody being awoken at 3:00 o'clock in the morning by a group of officers, some of whom have drawn weapons and saying, okay, come with us, we need to talk to you and taken outside in the middle of the night in his underwear in January and taking him down to the police station and trying to interrogate him." (*See* 1 RT 15–16).

**7.** Under *Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review raising the same claim, did not intend to change the California Court of Appeal's reasoned decision rejecting it.

go home, but the officer refused to let them leave. The court impliedly rejected [petitioner's] statement. Without [petitioner's] declaration, there is no evidence that any of the officers told [petitioner] that she had to stay or used any force or show of authority to suggest that she had no right to leave.

Nothing else about the environment was coercive. She waited in a lounge, which Detective Ortiz described as a lunch room with a sofa and television. She was not alone, but sat in the lounge with Noe. The record suggests that she was offered something to eat. [Petitioner] even admitted that she slept during part of the time as she waited for Ortiz to return from the autopsy.

Moreover, when Detective Ortiz, who spoke Spanish, returned to the station and asked [petitioner] to answer some additional questions, [petitioner] was cooperative. Although [petitioner] contends that she wanted to leave, she did not express this desire to Ortiz. She instead voluntarily responded to Ortiz's questions. The facts in this case indicate that Ortiz was simply beginning her investigation into Dana's suspicious death and, as concerned family members, [petitioner], Noe, and Lucy were being cooperative with the investigation, both at the hospital and at the police station. The fact that [petitioner] was with another member of her household suggests that the environment was not coercive and that the investigation was not targeted specifically at her. During the interview, Ortiz even questioned [petitioner] whether another person, possibly Noe, was responsible for Dana's injuries. Based on the facts, we conclude that the contact was not a detention, but a consensual encounter.

The Initial Interrogation

[Petitioner] contends that Detective Ortiz should have informed her of her Miranda rights before conducting the interview.

Under the federal Constitution, an individual who is subjected to a custodial police interrogation must be informed of his right to be silent and right to counsel. (See Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. 1602; [Citation omitted] ). An interrogation is custodial when the individual has been taken into custody or is otherwise deprived of his freedom of movement. [Citation omitted]. In making this determination, we apply an objective test, namely, whether there was a formal arrest or a restraint on the individual's freedom to the degree associated with formal arrest. [Citation omitted].

Because the facts indicated that the contact was not a detention up to this point, it is a foregone conclusion that the interrogation did not begin in a custodial setting. As discussed above, [petitioner] agreed to accompany Detective Ortiz to the police station and answer some additional questions. Despite the lengthy delay, [petitioner] waited in a relatively comfortable environment and was not restricted from leaving. The consensual nature of the encounter did not change simply because Detective Ortiz took her to an interview room. As observed by the court, the initial conversation between [petitioner] and Ortiz continued to be consensual. [Petitioner] voluntarily responded to Ortiz's questions. Under the circumstances, a reasonable person would not have believed that she was in custody or under arrest for Dana's death.

We conclude that [petitioner] was not in custody for purposes of Miranda and, therefore, Detective Ortiz had no obligation to inform [petitioner] of her constitutional rights.

The Court of Appeal proceeded to deny petitioner's claim that Detective Ortiz had failed to scrupulously honor the invocation of her right to remain silent when, after Ortiz stepped outside the room, petitioner told another officer that she needed to leave. The Court of Appeal determined that petitioner's statement was an ambiguous invocation of her right to remain silent, and that Ortiz's clarification questions following petitioner's statement and her act of then giving petitioner *Miranda* warnings were proper. The Court of Appeal found no evidence that Ortiz tricked or coerced petitioner into surrendering her rights, and concluded that petitioner had knowingly and voluntarily waived her rights. (*See* Lodgment No. 7 at 11–14).

### 2. *Petitioner's Fourth Amendment Claim*

In *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (emphasis added), the Supreme Court held that, where "the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at trial." California provides criminal defendants with such a full and fair opportunity through the procedures of Cal.Penal Code § 1538.5, which permits defendants to move to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment. *See Gordon v. Duran*, 895 F.2d 610, 613–14 (9th Cir.1990); *see also Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir.), *cert. denied*, 464 U.S. 933, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983); *Mack v. Cupp*, 564 F.2d 898, 901 (9th Cir.1977).

Here, the record reflects that prior to trial, the state trial court held a hearing on a motion by petitioner to suppress evidence (i.e., petitioner's statements) obtained during an allegedly illegal seizure that violated her Fourth Amendment rights; that the trial court reviewed all relevant documents and pursuant to the stipulation of the parties did not take live testimony; that petitioner's counsel was afforded the opportunity to be heard after the trial court indicated its tentative ruling; and that the trial court gave ample consideration to petitioner's arguments. (*See* 1 CT 57–81; 1 RT 9–26).

▮▮▮ In determining whether there was a full and fair opportunity for litigation of a habeas petitioner's Fourth Amendment claim, courts also consider the extent to which the claim was briefed before and considered by the state appellate courts. *See Terrovona v. Kincheloe*, 912 F.2d 1176, 1178–79 (9th Cir.1990), *cert. denied*, 499 U.S. 979, 111 S.Ct. 1631, 113 L.Ed.2d 726 (1991); *Abell v. Raines*, 640 F.2d 1085, 1088 (9th Cir.1981). Here, the record reflects that petitioner's Fourth Amendment claim was briefed before and considered by the California Court of Appeal, which issued a reasoned decision rejecting the claim. (*See* Lodgment No. 3 at 12–32; Lodgment No. 7 at 4–14). The Fourth Amendment claim also was briefed before and considered by the California Supreme Court. (*See* Lodgment No. 8 at 4–10; Lodgment No. 9).

Thus, based on the Court's own review of the record, the Court finds that petitioner did receive a full and fair opportunity to litigate her Fourth Amendment claim in the state courts. The Court therefore concurs with respondent that petitioner's Fourth Amendment claim is not cognizable on federal habeas review since it is barred by *Stone*.

### 3. *Petitioner's Fifth Amendment (Miranda) claim*

▮▮▮ A suspect who is subject to custodial interrogation has the right to remain silent. *See Miranda*, 384 U.S. at 444, 86

S.Ct. 1602; *see also Dickerson v. United States,* 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *United States v. Ross,* 123 F.3d 1181, 1187 (9th Cir.1997), *cert. denied,* 522 U.S. 1066, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998). "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *See Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602; *United States v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988). However, an officer's obligation to give a suspect *Miranda* warnings before interrogation arises only when the individual is "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotation marks omitted); *Yarborough v. Alvarado,* 541 U.S. 652, 663, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526.

Here, there are two components to petitioner's *Miranda* claim. First, petitioner contends she should have been given *Miranda* advisements at the beginning of her interview with Detective Ortiz. Second, petitioner contends that Detective Ortiz did not "scrupulously honor" her request to terminate the interview, thereby vitiating the *Miranda* waiver obtained immediately thereafter. Petitioner maintains that the admission at trial of her statements to Detective Ortiz prejudiced her. (*See* Pet. 12–15; Pet. Mem. at 12–32).

a. *The State courts' determination that petitioner was not in custody at the start of her interview was objectively unreasonable.*

As set forth above, in rejecting petitioner's suppression motion, the trial court found that petitioner was not unlawfully detained, that petitioner was not compelled to go to the police station, and that her statements were voluntary. The California Court of Appeal found that "[b]ecause the facts indicated that the contact was not a detention up to this point, it is a foregone conclusion that the interrogation did not begin in a custodial setting." (*See* Lodgment No. 7 at 10). Petitioner, however, contends that she was in custody for *Miranda* purposes at the time that she was taken into the interview room when Detective Ortiz returned from the autopsy because she had been placed in a police station lounge with an officer specifically assigned to sit with her, and the officer "would not let [her] leave." (*See* Pet. Mem. at 22 (citing petitioner's declaration at 1 CT 110), 25).[8]

The California Court of Appeal did identify the correct legal standard for evaluating whether an interrogation is custodial, citing *People v. Ochoa,* 19 Cal.4th 353, 401, 79 Cal.Rptr.2d 408, 966 P.2d 442 (1998), which in turn relied on *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (The test for whether an individual is in custody is an objective one: the issue is whether there was a 'formal arrest or restraint on free-

---

**8.** Although defense counsel argued in the trial court that the additional facts that petitioner was a 21–year–old, non-English speaker whose baby had just died are relevant to a custody determination for *Miranda* purposes (*see* 1 RT 19), the Supreme Court has held otherwise. *See Alvarado,* 541 U.S. at 666–68, 124 S.Ct. 2140.

dom of movement of the degree associated with a formal arrest') (internal citations omitted). The determination of whether an individual is "in custody" for purposes of *Miranda* is a mixed question of law and fact; but, "the state trial court's answers to the 'scene-and-action-setting questions' (i.e., the underlying factual questions) still are entitled to a presumption of correctness." *Bains v. Cambra,* 204 F.3d 964, 972 (9th Cir.) (quoting *Keohane,* 516 U.S. at 111–12, 116 S.Ct. 457), *cert. denied,* 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

Here, the California Court of Appeal found that the trial court had "impliedly rejected" petitioner's statement in her declaration that she had told the officer that she wanted to go home, but the officer refused to let them leave. (*See* Lodgment No. 7 at 9). However, that "implicit" credibility finding is not entitled to a presumption of correctness under *Taylor v. Maddox,* 366 F.3d 992 (9th Cir.), *cert. denied,* 543 U.S. 1038, 125 S.Ct. 809, 160 L.Ed.2d 605 (2004) because the State courts' fact-finding process was defective. In *Taylor,* the Ninth Circuit clarified the interplay between 28 U.S.C. § 2254(d)(2) and (e)(1). The Ninth Circuit held that § 2254(d)(2) "most readily" applies where the petitioner challenges the state court's findings or fact-finding processes entirely on the state record, and that only once the State court's fact-finding process has survived intrinsic review, or where the petitioner does not raise an intrinsic challenge to the facts, are the State court findings dressed in a presumption of correctness.[9] *See Taylor,* 366 F.3d at 999; *see also Sarausad v. Porter,* 479 F.3d 671, 699 n. 5 (9th Cir.2007) (" § 2254(e)(1) does not apply to challenges brought under § 2254(d)(2)").

The Ninth Circuit described several scenarios where a State court's fact-finding process itself is defective: where a State court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence; where the State court "plainly misapprehends or misstates the record" in making the findings; or where the State court had before it evidence that supports the petitioner's claim, but where the State court "apparently ignores" that evidence. *Id.*

■ Here, the State courts' fact-finding process with respect to the credibility of petitioner's statements regarding what transpired at the police station prior to the commencement of her interview does not survive intrinsic review. In issuing its ruling, the trial court made *no mention* of the circumstances surrounding petitioner's wait once she arrived at the police station. (*See* 1 RT 14–15). While the trial court vaguely acknowledged during argument defense counsel's characterization of the officer as someone sent to "guard" petitioner while she waited at the station (*see* 1 RT 20), the trial court did not discuss petitioner's specific allegations regarding what transpired while she sat with the officer in the lounge—i.e., that she asked to leave and was rebuffed, that when she got up, the officer got up, and that she asked to make phone calls but was denied. As noted above, by stipulation of the parties, the trial court here did not hear live testimony at the hearing on the suppression motion (*see* 1 RT 24–25), and thus had no basis for discrediting petitioner's account based on her demeanor while testifying. In its opposition to the motion to suppress, the prosecution did not contest petitioner's factual account of her wait at the station,[10] and submitted no exhibits or

---

9. The Supreme Court has not decided this issue so this Court is bound by *Taylor. See Rice v. Collins,* 546 U.S. 333, 339, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (declining to

decide whether § 2254(d)(2) and (e)(1) merge).

10. The prosecution did note that petitioner had been offered food and water, which she

declarations to contradict it. As the Ninth Circuit noted in *Taylor*, a negative inference can be drawn from the prosecution's failure to produce, at least through declaration, the police officer who was assigned to sit with petitioner. *See Taylor*, 366 F.3d at 1013 n. 15 (noting that "it would be a fair inference here that the testimony of ... the officer [who had been involved in the custodial interrogation but whose testimony had not been presented] would have been unfavorable to the state.").

Therefore, to the extent that the trial court even made an "implicit" credibility finding with respect to petitioner's statements regarding what transpired at the police station prior to the commencement of petitioner's interview, the Court finds that such "implicit" credibility finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Therefore, the State courts' "implicit" credibility finding is not presumed correct. *See Perez v. Rosario*, 459 F.3d 943, 950 (9th Cir.2006). Under *Taylor* then, it is necessary to set aside the State courts' findings and make new ones. *See* 366 F.3d at 1008. Since petitioner's account of what transpired at the police station prior to the commencement of her interview was uncontradicted, the Court will credit it. Further, in light of petitioner's account, the Court finds and concludes that the State courts' determination that petitioner was not already in custody at the start of her interview was objectively unreasonable for the reasons discussed below.

■ In *Alvarado*, 541 U.S. at 655–56, 124 S.Ct. 2140, a 17–year–old suspect in a homicide was taken to the police station by his parents for questioning. The Supreme Court found that the State courts' finding that he was not in custody did not involve an unreasonable application of clearly established Supreme Court law because ignoring for the moment the deferential standard under § 2254(d)(1), "fair-minded jurists could disagree over whether Alvarado was in custody." Because of the "differing indications," the State court's application of the custody standard was reasonable. *See id.* at 665, 124 S.Ct. 2140. Here, by contrast, the Court finds that fair-minded jurists could not disagree over whether petitioner was in custody at the start of her interview. The factors that overwhelmingly favor a finding that petitioner was in custody are: petitioner was driven to the station by police because Lugo's vehicle had been impounded by police precisely because of Dana's suspicious death (*see* 1 RT 213), and thus petitioner's level of control over her presence was minimal; she waited for more than seven hours to be interviewed by Detective Ortiz at the police station, guarded by a police officer who had been assigned to sit with her and Lugo from the time they arrived; petitioner was never told that she was free to leave and was never told she was not under arrest; petitioner asked to leave and was not allowed to leave; petitioner asked to use the phone and was not allowed to do so; every time petitioner got up in the police lounge, so did the officer guarding her; petitioner's interview lasted some three hours, including an hour and a half before she was given *Miranda* warnings; although Ortiz did not threaten petitioner with arrest or prosecution, she repeatedly told her that someone was "lying" to her; that she needed to know the truth because someone "beat" that little girl; and that petitioner had "better ... explain what happened"; petitioner was never giv-

---

had refused, and that she had slept while waiting. (*See* 1 CT 91). During her interview with Detective Ortiz, petitioner herself had admitted that she had slept while waiting.

She indicated that she had not eaten, and she declined the water that Ortiz offered her. (*See* 2 CT 442).

en an opportunity for a break during the interview except a de facto one when Detective Ortiz herself needed to attend to police business, and then, petitioner was instructed to "stay here"; and finally, petitioner was arrested at the conclusion of the interview. *Compare United States v. Wauneka,* 770 F.2d 1434, 1438–39 (9th Cir. 1985) (suspect in custody where he was transported to BIA office by two armed officers, was placed in large conference room with four to five officers who each questioned him, where officers were accusatory, questioning lasted over an hour, suspect broke down crying but questioning continued, he had no means of transportation, and he was not offered an opportunity to leave prior to confession); *United States v. Ollie,* 442 F.3d 1135, 1137–40 (8th Cir.2006) (parolee in custody where interview took place at police station, and although twice told he was not under arrest, his agreement to talk to police showed little more than an absence of resistance and response to pressure) *with Mathiason,* 429 U.S. at 494, 97 S.Ct. 711 (person not in custody where he comes voluntarily to the police station, is immediately informed that he was not under arrest, and is allowed to leave at the close of a half-hour interview); *California v. Beheler,* 463 U.S. 1121, 1121–22, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (same); and *People v. Stansbury,* 9 Cal.4th 824, 831–32, 889 P.2d 588, 38 Cal.Rptr.2d 394 (Cal.) (suspect not in custody when he was asked if he would come to police station and voluntarily agreed, was offered the choice of taking his own car or riding in the front seat of police car, was twice told police only wanted to question him as a "possible witness," and where interview was brief and not accusatory), *cert. denied,* 516 U.S. 923, 116 S.Ct. 320, 133 L.Ed.2d 222 (1995).

The only factors weighing in favor of a finding that petitioner was not in custody are: she voluntarily agreed to go to the police station in the first instance; she was not told she was under arrest or threatened with arrest or prosecution; and she waited for her interview in an apparently fairly comfortable police lounge. However, these factors are not persuasive in light of the other circumstances. Though petitioner was not told she was under arrest, neither was she told that she was *not* under arrest or was free to leave, and in fact when she asked to leave, she was not allowed to do so. Indeed, she was not even allowed to make phone calls. That petitioner waited in a police lounge as opposed to being handcuffed to a chair in an interrogation room, for example, is of little import in light of the fact that she was guarded by a police officer for the duration of her seven-plus hour wait—one who got up every time she did. Finally, that petitioner voluntarily went to the police station is not itself sufficient to support a finding that she was not in custody *once she arrived at the station* and was subsequently guarded by an officer who would not let her leave. While the initial questioning of petitioner was more general in nature—geared toward eliciting background information, and only as the interview progressed did the questioning focus more on petitioner's actions, this does not suggest petitioner was not in custody at the start of her interview. Whether police actually considered petitioner a suspect by the time she arrived at the station or by the time she was taken in for an interview is irrelevant when undisclosed; the only relevant inquiry is how a reasonable person in the suspect's position would have understood his situation. *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526.

Given the circumstances described *supra,* the Court finds that a reasonable person in petitioner's position would not have felt free to leave while being guarded by a police officer in a police lounge for an

entire day, particularly when the person had asked to leave and been rebuffed. Further, the Court finds that the kinds of restraints put on petitioner's movement while she waited in the police lounge were "of the degree associated with a formal arrest." *See Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526. The Court therefore finds and concludes that petitioner's constitutional rights under the Fifth Amendment were violated when she was not read her *Miranda* rights at the commencement of her interrogation, and that the State courts' determination to the contrary was objectively unreasonable.

However, petitioner is not entitled to habeas relief on her *Miranda* claim unless the constitutional error had "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Sims v. Brown,* 425 F.3d 560, 570 (9th Cir.2005) (applying *Brecht* to confession obtained in violation of *Miranda* ), *amended by* 430 F.3d 1220 (9th Cir.2005), *cert. denied,* —— U.S. ——, 127 S.Ct. 62, 166 L.Ed.2d 56 (2006). Here, there is a preliminary determination to be made before the issue of prejudice can be decided: whether petitioner's statement made after the *Miranda* warnings were given would have been admissible even though her unwarned statement was not.

b. *Petitioner's post-Miranda statement would have been admissible at trial nothwithstanding the Miranda violation.*

■ For the following reasons, the Court finds and concludes that petitioner's post-*Miranda* statement would have been admissible at trial notwithstanding the *Miranda* violation.

i. *Detective Ortiz did not deliberately employ a two-step interrogation strategy to undermine Miranda.*

In *Missouri v. Seibert,* 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court addressed the admissibility of a second confession made after *Miranda* warnings were given "midstream" during an interrogation, following an "unwarned" confession. At a hearing to exclude all of Seibert's statements, the officer testified that he had made a "conscious decision" to withhold *Miranda* warnings, using a technique whereby he would "question first, then give the warnings, and then repeat the question 'until [he] get[s] the answer that she's already provided once.' " *Id.* at 605, 124 S.Ct. 2601. A plurality of the Supreme Court concluded that the postwarning statements were inadmissible. *Id.* at 617, 124 S.Ct. 2601. It held that the "threshold issue" when interrogators question first and warn later is whether it would "be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611–12, 124 S.Ct. 2601. The Court found that in the circumstances exemplified here, the warnings could not have served their purpose. Rather, upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect's likely reaction would be "perplexity about the reason for discussing rights at that point." Worse yet, telling a suspect that anything he says could be used against him without expressly excepting the statement just given "could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." *Seibert,* 542 U.S. at 613, 124 S.Ct. 2601.

The plurality distinguished *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), wherein the Supreme Court had found a postwarning statement

admissible where the suspect had made an earlier unwarned statement. Because the earlier admission in *Elstad* was made during a brief discussion in the suspect's living room that resulted from the officer's "innocent neglect" to *Mirandize* the defendant and did not determine the character of the later, warned confession made during a systematic interrogation, the warned confession was admissible. The plurality characterized the *Elstad* court's reading of the living room conversation as a "good-faith *Miranda* mistake ... open to correction by careful warnings before systematic questioning in that particular case [and] posing no threat to the warn-first practice generally." *Seibert,* 542 U.S. at 614–15, 124 S.Ct. 2601.

In his concurrence, Justice Kennedy felt the plurality's conclusion that "whenever a two-stage interview occurs, admissibility of the postwarning statements should depend on 'whether [the] *Miranda* warnings delivered midstream'" were effective, given the specific facts of the case, "cut[ ] too broadly." Justice Kennedy argued that "the admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the *deliberate* two-step strategy was employed." (Emphasis added). If the deliberate two-step strategy was used, the postwarning statements relating to the pre-warning statements must be excluded unless curative measures were taken before the postwarning statement was made. *Seibert,* 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring).

In *Seibert,* then, the Supreme Court did not set forth a "per se" inadmissibility rule regarding a second, postwarning statement following an unwarned statement. The Ninth Circuit has found Justice Kennedy's concurrence in *Seibert* to be the Supreme Court's holding "because it is the narrowest grounds with which the majority of the Court would agree." *United States v.*

*Williams,* 435 F.3d 1148, 1157–58 (9th Cir. 2006); *see also United States v. Narvaez–Gomez,* 489 F.3d 970, 973 (9th Cir.2007). The Ninth Circuit has found that "deliberateness" is shown where:

> "objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning. Objective evidence includes the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Narvaez–Gomez,* 489 F.3d at 973 (internal quotations omitted).

Here, although no State court had an occasion to consider whether the postwarning statement would have been inadmissible under *Seibert,* there is evidence in the record on which that determination can be made. The objective evidence shows that petitioner was taken to the police station in a police vehicle following a lengthy wait at the hospital; petitioner waited in a police lounge for some seven-plus hours with a police officer assigned to sit with her; at nearly 4:00 p.m. the day after her daughter's death, Detective Ortiz took her into an interrogation room and without *Miranda* warnings, questioned her for an hour and a half regarding her background, family, relationship with Lugo and his family, and what had happened to Dana; when petitioner made statements regarding having thrown Dana to the floor when Dana twice stood up the night she died, having gotten "mad" and frustrated with her kids, and having had no intent to kill Dana, Ortiz took a break and exited the room; within minutes, Ortiz returned to the room after petitioner indicated to another officer that she wanted to leave; Ortiz then gave petitioner *Miranda* warnings and continued to question her, asking her to "tell me again" what happened to the little girl the

night before ... when you put her to bed, and making references to what petitioner had already stated (i.e., Dana did not want to go to sleep; "you grabbed her and threw her down"; "she landed face down," etc.); and petitioner repeated her earlier statements, and then, when Ortiz and petitioner were briefly joined by another officer, petitioner demonstrated with a rag doll how she had thrown Dana down to the floor.

The subjective evidence includes Detective Ortiz's testimony at trial. Ortiz testified that at the police station, she first interviewed Lugo's sister, and then attended Dana's autopsy, where she learned the cause of death was blunt force trauma to the abdominal area, which caused massive internal bleeding; and that after the autopsy, she interviewed petitioner in Spanish. (*See* 1 RT 214–17). Ortiz had additionally testified at the preliminary hearing that at the beginning of the interview with petitioner, she was not under arrest, but that she (Ortiz) gave her *Miranda* warnings during the interview. Ortiz testified: "During the initial conversation with her, she had stated she had simply put the child to sleep on the living room floor. As we continued to talk she then indicated that she had been angry and frustrated and that she had thrown the child down. When she started making those statements, I advised her of her right[s]." Ortiz agreed with the prosecutor's characterization that she had given petitioner her *Miranda* rights out of "an abundance of caution." (*See* 1 CT 17–18).

While the objective factors considered by the Court do tend to weigh in favor of a finding of "deliberateness," the subjective factors do not. As set forth, Ortiz testified that she only gave petitioner *Miranda* warnings once she started making what Ortiz apparently decided were inculpatory statements, and she agreed with the prosecutor that it was out of "an abundance of

caution." According to Ortiz, petitioner was not formally under arrest when she was taken to the police station, when her interview began, or when she was advised of her *Miranda* rights (*see* 1 RT 213–14, 1 CT 6), and the evidence does not show that, at least in that first (pre-warning) interview, Ortiz was interviewing petitioner for the *purpose* of getting a confession out of her. (*See* 2 RT 419 (Ortiz testifying that the goal of an interrogation is not to get a confession, but to get the truth)). By the time she interviewed petitioner, although she knew the cause of death, she did not know who was responsible for Dana's injuries. (*See* 2 CT 465, 478, 500–503, 507 (Ortiz asking petitioner about Lugo's family members and whether they had ever done anything to the children, whether Dana had complained of injuries before, whether petitioner had heard Dana scream or cry before Lugo knocked on the door, and whether anyone at the home had a reason to lie to Ortiz)). On this record, the Court is not prepared to find that Detective Ortiz employed a two-step strategy to *deliberately* undermine *Miranda*.

### ii. Petitioner's postwarning statement was voluntary.

Under Justice Kennedy's concurrence in *Seibert*, since Detective Ortiz did not deliberately employ a two-step interrogation strategy to undermine *Miranda*, the admissibility of petitioner's postwarning statement would have been governed by the principles of *Elstad*. There, the Supreme Court held that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earli-

er statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights. [...]" 470 U.S. at 313, 105 S.Ct. 1285. The Ninth Circuit has held that "[t]he test for determining whether a confession is voluntary is 'whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.'" *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir.1997), *cert. denied,* 522 U.S. 1130, 118 S.Ct. 1083, 140 L.Ed.2d 140 (1998); *see also Henry v. Kernan,* 197 F.3d 1021, 1026–27 (9th Cir. 1999) ("The test of voluntariness is well established: 'Is the confession the product of an essentially free and unconstrained choice by its maker?'").

Here, there is no evidence that police used deliberately coercive or improper tactics to obtain the initial unwarned statement from petitioner. Neither "the environment nor the manner of 'interrogation'" was coercive. *Elstad,* 470 U.S. at 315, 105 S.Ct. 1285. Petitioner was held in a police lounge for several hours prior to questioning and though an officer was assigned to sit with her, she slept while she waited for Ortiz to return from Dana's autopsy. There is no evidence that Ortiz used physical force against petitioner, that she threatened her in any way, or that she denied any of petitioner's basic needs. In fact, when Ortiz took her into the interrogation room, the first thing she did was check on petitioner's well-being. (*See* 2 CT 442 (Ortiz, at start of interview, asking whether petitioner had slept and eaten, and offering her water)). Ortiz's repeated advisements to petitioner to tell the truth and her misrepresentations about other persons' accounts do not amount to coercion. *See Amaya–Ruiz,* 121 F.3d at 494–95. The circumstances present here simply were not akin to those where the initial unwarned statement (followed by another confession) was found to be the result of police coercion. *Cf. Darwin v. Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (suspect interrogated for 48 hours incommunicado while officers denied access to counsel); *Beecher v. Alabama,* 389 U.S. 35, 36, 88 S.Ct. 189, 189, 19 L.Ed.2d 35 (1967) (officer fired rifle next to suspect's ear and said "If you don't tell the truth I am going to kill you"); *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (suspect was arrested without probable cause, interrogated for nine days with little food or sleep, and gave three unwarned "confessions" each of which he immediately retracted).

With respect to petitioner's second (warned) statement, Ortiz testified that she read petitioner all of her rights from a *Miranda* card in Spanish (1 CT 18). The transcript reflects that when asked whether she understood these rights, petitioner responded, "yes." (*See* 1 CT 493). And although the transcript reflects "15 seconds of silence" in response to Ortiz's question, "Having these rights in mind, do you want to continue speaking with me?", the Court of Appeal noted that the trial court had detected an affirmative response. Petitioner does not challenge this finding, and it is entitled to a presumption of correctness. *See Taylor,* 366 F.3d at 999–1000; *see also Bains,* 204 F.3d at 972 ("scene-and-action-setting questions" are entitled to a presumption of correctness). In any event, the transcript reflects that petitioner proceeded to answer Ortiz's questions for another nearly hour and a half period. *See Elstad,* 470 U.S. at 318, 105 S.Ct. 1285 ("The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."). Further, although the Court has found a violation of petitioner's rights when she was not given *Miranda* warnings at the start of her interview, there is no evidence

that "the officers exploit[ed] the unwarned admission to pressure [petitioner] into waiving [her] right to remain silent." *Id.* at 316, 105 S.Ct. 1285.

The Court therefore finds and concludes that the State courts' determination that petitioner's post-*Miranda* statement was voluntarily given was not objectively unreasonable.[11]

 *iii. Petitioner's Miranda waiver was not vitiated by Detective Ortiz's failure to "scrupulously honor" petitioner's alleged invocation of her right to remain silent.*

Petitioner also maintains that Ortiz failed to "scrupulously honor" her invocation of her right to remain silent when she said "I need to leave," thereby vitiating petitioner's subsequent waiver of her *Miranda* rights. (*See* Pet. Mem. at 26–29).

In *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court observed that a "critical safeguard" of *Miranda* is that the person have the "right to cut off questioning" so that "[t]hrough the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. 321. The defendant's invocation of his constitutional rights against self-incrimination or to counsel cannot be ignored irrespective of whether *Miranda* warnings

have been given. *See Miranda,* 384 U.S. at 472, 86 S.Ct. 1602.

In finding petitioner's statement "I need to leave" to be an ambiguous invocation of her right to remain silent, the California Court of Appeal reasoned:

 "[V]iewed in context, the officers reasonably could have interpreted [petitioner's] statement an expression of impatience for having to wait for Detective Ortiz. [Petitioner] made the statement to another officer while Ortiz stepped out of the room. [Petitioner's] statement also reasonably could be construed as indicating a need to be elsewhere or tend to other matters. [Petitioner] stated that she wanted to see her son."

The Ninth Circuit has observed that "neither the Supreme Court nor this court has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.'" *See Arnold v. Runnels,* 421 F.3d 859, 865 (9th Cir.2005); *see also Anderson v. Terhune,* 516 F.3d 781, 2008 WL 399199, at *4 (9th Cir. Feb. 15, 2008) (en banc) ("Nothing was ambiguous about the statement 'I plead the Fifth.' Ambiguity means 'admitting more than one interpretation or reference' or 'having a double meaning or reference.'"). Petitioner maintains that her request to leave "obviously included a request to terminate the interview." (*See* Pet. Mem. at 26). However, "I need to leave" is not the same as "I have nothing to say," and "admit[s] more than one interpretation." As noted by the California Court of Appeal, petitioner made the statement while waiting for the interrogat-

---

**11.** Because the issue of whether petitioner's post-Miranda statement was voluntarily given is a different issue from whether petitioner was in custody for *Miranda* purposes at the commencement of her interrogation, the AEDPA's deferential standard of review remains applicable to the State courts' determi-

nation of the voluntariness of petitioner's post-*Miranda* statement, and infra, to the State courts' determination of the voluntariness of petitioner's waiver of her *Miranda* rights with respect to her post-*Miranda* statement.

ing officer to return to the interview room after already waiting an entire day for the officer—suggesting impatience, and she nearly concurrently expressed a desire to see her son—suggesting she had other things to which to tend. Accordingly, the Court finds that the State courts' determination that petitioner's alleged invocation of her right to silence was ambiguous was not objectively unreasonable.

■ Further, *even if* petitioner's statement that she needed to leave did constitute an unambiguous invocation of her right to remain silent, petitioner could still waive her right provided that the waiver was (a) voluntary, and (b) knowing and intelligent. *See Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). The "two dimensions" of the inquiry include assessment of whether "relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and whether "the waiver [was] . . . made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *See id.* A waiver of *Miranda* rights need not be express; it can be inferred from the words and actions of the suspect. *See North Carolina v. Butler,* 441 U.S. 369, 373–75, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Terrovona,* 912 F.2d at 1179. The state courts' determination as to a knowing and intelligent waiver is a determination of fact. *See Amaya–Ruiz,* 121 F.3d at 495 (9th Cir.1997) ("The state trial court's finding that [petitioner] knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness."); *Collazo v. Estelle,* 940 F.2d 411, 415 (9th Cir.1991) (en banc) (clarifying that the federal courts give a presumption of correctness to a state court's determination of

historical facts underlying a finding that a waiver of *Miranda* rights was knowing and voluntary), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992).

■ Petitioner does not challenge the finding of the trial court that the tape reflected an affirmative response to the inquiry of whether petitioner, with her "rights in mind," wished to continue speaking. So, that finding is entitled to a presumption of correctness that petitioner has not purported to rebut. As the California Court of Appeal found, Ortiz did not exert trickery or coercion to get petitioner to waive her rights, supporting the finding that her waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *See Spring,* 479 U.S. at 573, 107 S.Ct. 851. Further, the evidence shows that petitioner knowingly and intelligently waived her *Miranda* rights. Ortiz read petitioner her *Miranda* rights in full in Spanish and asked petitioner if she understood her rights. Petitioner responded that she did (*see* 2 CT 492–93), and proceeded to answer Ortiz's questions. Petitioner has made no contention that she "failed to understand the basic privilege guaranteed by the Fifth Amendment" or "misunderstood the consequences of speaking freely to the law enforcement officials."

Accordingly, the Court finds and concludes that the State courts' determination that petitioner's constitutional rights were not violated by Ortiz's failure to scrupulously honor petitioner's alleged invocation of the right to remain silent neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.[12]

---

**12.** Respondent submits that the California Court of Appeal's decision may have been contrary to Supreme Court law given the Court of Appeal's citation of *Davis v. United*

c. *The admission of petitioner's unwarned statement did not have a substantial and injurious effect or influence in determining the jury's verdict.*

■ The only issue remaining to be decided is whether the constitutional error in admitting petitioner's unwarned statement at trial prejudiced her. Here, petitioner's unwarned statement was substantially the same as her warned statement. In the former, petitioner stated that she was the only one who disciplined the children and she admitted that she had tossed Dana to the pillow the night she died when Dana would not go to sleep, and that Dana had landed face down on a cup. Petitioner denied that she had any intent to kill Dana and stated that she did not think that if she had hit her, she had broken her ribs. She admitted that she did get frustrated with her children and was firm with them. (*See* 2 CT 469, 480, 483–84, 490–91). In her postwarning statement, petitioner again explained that she grabbed Dana by the hand when she stood up, said "go to bed" and then threw her on the pillow, where she landed on a little cup. She responded that she did not think she had kicked her, and she denied hitting her in the stomach. She again stated that if she did something to her little girl, it was not with the intention of killing her. She admitted that she had (at some unspecified time) put her foot on Dana's diaper. She stated that she was not the perfect mother, and was tough with her children so they

would learn. When petitioner was told she was going to jail, she asked if she was the only one going. When Ortiz asked who else should go, petitioner responded that she did not want to blame anyone else but also did not want to be responsible. (*See* 2 CT 494–95, 504–05, 509, 511). In both statements, petitioner indicated that she had not seen anyone else hit the children. (*See* 2 CT 469, 503).

In light of the substantial similarities between the unwarned and the warned statements, and the Court's finding that petitioner's warned statement would have been admissible notwithstanding the *Miranda* violation, the Court is unable to find that the admission of petitioner's unwarned statement had a "substantial and injurious effect or influence in determining the jury's verdict." Accordingly, the Court finds and concludes that habeas relief is not warranted with respect to petitioner's *Miranda* claim.

**B.** *Habeas relief is not warranted with respect to petitioner's claims relating to her corrected declaration.*

1. *The record below*

As noted above, in support of petitioner's suppression motion, petitioner's counsel filed a declaration under petitioner's name. Although the trial court considered the declaration in denying the motion, the declaration had not been executed. During trial, when the prosecutor

---

States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), because *Davis* held that "once a suspect has been advised of his *Miranda* rights and waived them, in order to halt police questioning once it has begun, the suspect must unambiguously assert his right to silence or to counsel," (*see* Ans. Mem. at 11), but here, petitioner had not been advised of her *Miranda* rights when she allegedly invoked her right to silence. The Court disagrees with respondent's analysis. The California Court of Appeal did not cite *Davis*

directly. Rather, the Court of Appeal cited *People v. Stitely*, 35 Cal.4th 514, 535, 26 Cal. Rptr.3d 1, 108 P.3d 182 (2005), which in turn cites *Davis*, and the Court of Appeal cited *Stitely* in its discussion of *how a* suspect invokes his right to silence; it did not inappropriately rely on *Davis* for some "different" rule of law applicable when a suspect invokes his right to silence before *Miranda* warnings are given. In this regard, the Court of Appeal correctly applied *Mosley* and *Miranda*.

prepared to cross-examine petitioner if she took the stand, she discovered that neither her copy of the declaration nor the copy filed with the court had been signed. When the prosecutor brought this to the attention of the court and defense counsel, defense counsel stated, "[t]hat was definitely an oversight on my part, your Honor. I believe on that day I was so flabbergasted by the Court's tentative ruling, that I neglected to actually have her read or have the document translated." Defense counsel then stated, "if the Court would give us one minute, we can do that right now. We can have this translator translate that and have her sign the declaration." Counsel stated that petitioner did not recall having seen the declaration. (*See* 2 RT 453–54). Counsel then pointed out that he had "mixed up" the two husbands and why she had left each, and that he had indicated "Dana's father" where it should have said "Maxwell's father." The trial court instructed defense counsel to make whatever changes were necessary to make the paragraphs accurate, then have petitioner initial the changes. When the trial court commented that "she ought to be able to know what she said," defense counsel responded, "It was definitely my fault. In fact, I'm going to offer to the Court and to the district attorney my original notes that I took with my client when I visited her at the jail on January 8th of 2002." Defense counsel noted further changes proposed by petitioner. Referring to paragraphs 11 and 12 of the declaration,[13] the first bath was taken at 8:00 p.m., the second bath at 9:30, and then "9:45 or some time between then and when he left, which is the half hour, not two hours." Defense counsel maintained that he had made some assumptions about the various times indicated in the declaration. The prosecutor responded that it was "extremely coincidental" that she had advised defense counsel that she would be using the declaration and that now, one of the discrepancies between the declaration and the evidence was "suddenly in error." (*See* 2 RT 455–57). The trial court indicated that if defense counsel's notes did not reflect that petitioner said at some point "9:30," then the declaration should "stand as it was executed at the time it was submitted to the Court as her declaration." If petitioner wanted to testify to the contrary on the stand, she would be subject to impeachment or cross-examination. Defense counsel stated that in his notes, there was a reference to a first bath at 8:00 p.m., and then a second bath between 8:00 p.m. and 11:00 p.m. The prosecutor stated "[s]o perhaps since it is the defendant who is signing this, not Mr. Inkman [defense counsel]—we should be able to inquire from the defendant for the purpose of the declaration if, in fact, paragraph 11 as submitted to the Court is correct." Defense counsel responded, "please do." (*See* 2 RT 458–59).

Petitioner testified that there were some errors in the declaration, including "the hour there, it's not like it says right there." She testified that she had seen the declaration before, but did not believe that when she saw it some time back that anybody had read it to her. It had been submitted to her in English. When asked by the

---

**13.** Paragraph 11 originally read: "On August 13, 2001, at 6:00 PM, I arrived back at my apartment. Noe, his sister Lucy, his parents and my two children were all at the apartment. I made dinner for my children; and I put my daughter to sleep. At about 8:00 PM, my son and I took a cool bath." Paragraph 12 originally read: "While I was taking a bath, at approximately 8:30 PM, Noe came in with my 16 month old daughter, Dana, and said she was very sick. I noticed she was having problems breathing." (*See* 1 CT 108). Defense counsel admitted that he had not specifically mentioned "a second bath" in the declaration, which caused some of the present confusion. (*See* 2 RT 459).

court whether she read English, she stated, "I'm learning." Petitioner testified that when she read the declaration, she understood "some," but did not ask for help for the parts she did not understand. Regarding paragraph 11, petitioner testified that it should read that she arrived at her apartment at 5:00 p.m. (not 6:00 p.m.); that Noe, his parents, herself, and her two children (but not Lucy) were there; that at about 8:30 p.m. she bathed her son and daughter (this bath was not mentioned in the original declaration); and that "after 9:00 p.m." (not 8:00 p.m.), she took a bath with her son. Regarding paragraph 12, she testified that only the hour was incorrect-it should read "around 10:00," (not 8:30 p.m.). In response to the court's inquiry, petitioner testified that she now reads English better than she read it when the declaration was submitted to her for her review. She testified that she had been able to read the English transcripts of the interviews during trial but still had "some words" she did not understand. (*See* 2 RT 460–66).

By this time, petitioner still had not signed the declaration. The court indicated that she should be willing to sign it now that the corrections had been made. Defense counsel pointed out an additional error—paragraph seven should read that Maxwell was then age two years and four months, not three years. At this point, the prosecutor asked to see the copy of the declaration in front of petitioner, which was not the one the court had, but a separate one to which petitioner had been referring while on the stand. It appeared that some corrections had been made to that copy of petitioner's declaration prior to coming into court. Defense counsel

stated that he had given that copy to petitioner the night before, and that it contained pencilled corrections made by petitioner while defense counsel was with her going over it, in English. Regarding communicating with petitioner in English, defense counsel stated, "We fumble. It's fine, though. I think I'm getting across to her, I'm pretty sure." When the court inquired why the errors were there in the first place, counsel stated that he had written the declaration off of his notes. Petitioner had not reviewed the final draft of the declaration before it was submitted to the court because counsel filed it and it was to be executed by petitioner when she showed up in court at the hearing, but counsel then never had it translated to her. The prosecutor requested that she or the court be allowed to see the corrections "allegedly" made the night before. The court instructed the prosecutor to take a look. (*See* 2 RT 466–70).[14]

The prosecutor stated that the only correction to paragraph 11 was the last sentence which originally read, "At about 8:00 p.m. my son and I took a cool bath." Petitioner had scratched out "8:00 p.m." and written in "Let's say before 10:00 p.m." Underneath that, she added, "Made dinner for my children and I put my daughter to sleep [ . . . ] around 8:30 or 9:00 p.m." There was no change to the first hour (regarding when petitioner arrived home). With respect to paragraph 12, the "8:30" was not scratched out, the only correction was a note reading, "10:00, 10:00." [15] These corrections were aside from those made involving the boyfriends and Maxwell's age. The prosecutor then requested that if petitioner took the stand (at trial), she be allowed to question her

---

**14.** Defense counsel later stated that he had not seen that declaration with the pencil-notes on it until court; he had left it with petitioner, and those were her pencil notes. (*See* 2 RT 476).

**15.** It appears that the court reporter mistyped what was actually written; it should have read, "10:10." (*See* 3 RT 550).

regarding the changes made to the declaration in court and those made the previous evening. Defense counsel stated, "I'm not opposed to that at all. If we can just limit it to the declaration and not a declaration in support of a motion to suppress the confession." The prosecutor requested that petitioner sign the declaration with the pencil corrections. The court instructed petitioner to sign the "the one copy today that she has indicated has the corrections on it." Petitioner did so. (*See* 2 RT 470-74).[16]

The prosecutor pointed out that the declaration with the changes to which petitioner testified did not read as petitioner had indicated it should; instead, it read, "On August 13, 2001, at 5:00 p.m., I arrived back at my apartment. Noe, his [sic] his parents and my two children were all at the apartment. I made dinner for my children; and I put my daughter to sleep. At about around 9:00-9:30, my son and I took a cool bath." The changes to paragraph 12 were consistent with petitioner's testimony. In addition, in paragraph 30 regarding her interview with Detective Ortiz, petitioner had added the word "thought" to one sentence, so that it now read, "At one point after about an hour Detective Ortiz told me that if I just admitted that I pushed my daughter down on the bed to go to sleep; I *thought* [I] would immediately be allowed to go home." The trial court ruled: "She has now signed that under penalty of perjury and she has testified under penalty of perjury. And that

version and what she testified to here in court today and the version reflected in the penciled notes ... are all fair game for cross-examination." (*See* 2 RT 474-76).

Petitioner did take the stand in her defense and was cross-examined regarding the discrepancies in her declarations—the original declaration, and the two modified versions. In short, petitioner testified that she did not see a big difference in the varying times on the two declarations, that they were all approximations, and that she had not been watching a clock, but she was unable to explain the differing times in detail and did admit in some instances she had failed to correct certain times despite the opportunity to do so. (*See* 3 RT 548-54). The declarations were not offered into evidence.

2. *Petitioner's claim that compelling her to sign the declaration violated her Fifth Amendment privilege against self-incrimination* [17]

■ Petitioner claims, as she did on direct appeal, that by requiring her to sign the declaration, the trial court forced her to make a statement that could be used against her at trial in violation of her Fifth Amendment right against self-incrimination. (*See* Pet. Mem. at 51). In rejecting this claim, the California Court of Appeal reasoned that nothing in the record suggested that petitioner had signed the document involuntarily. (*See* Lodgment No. 7 at 18). The Court concurs.

---

**16.** Although the California Court of Appeal found that the trial court also had petitioner sign the "copy modified on the previous night" (*see* Lodgment No. 7 at 15), the Court's review of the record does not substantiate this.

**17.** To the extent that petitioner purports to be raising a separate claim alleging trial court error in requiring petitioner to sign the declaration (*see* Pet. Mem. at 50), that claim is not

cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 67-68, 112 S.Ct. 475 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution.").

The standard for determining the voluntariness of a statement has already been set forth above. The Supreme Court has observed that, "[t]he sole concern of the Fifth Amendment ... is governmental coercion." *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) ("Though courts look to the totality of circumstances to determine whether a confession was voluntary[,]" police coercion is a "crucial element"); *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 348, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963) ("[a] coerced confession claim ... always involves this question: did the governmental conduct complained of 'bring about' a confession 'not freely self-determined'?"). Here, the proceedings in the trial court regarding the unexecuted declaration and the trial court's instruction to petitioner to sign the declaration do not show any governmental coercion. The trial court did not threaten petitioner, exert undue influence over her, or imply any adverse consequence would result if petitioner did not sign the declaration; the trial court simply noted that since petitioner had been able to make the necessary changes to the declaration, she ought to be willing to sign it, and then instructed her to do so. *Cf. Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (finding government coercion where suspect was questioned by police while in intensive care unit at hospital after being seriously injured a few hours earlier, when he was nearly in a coma, complained of unbearable pain, was unable to think clearly, and was at the complete mercy of the officer interrogating him). Contrary to petitioner's assertion that she would not have signed the declaration had the trial court not directed her to do so, there is no evidence that she signed the document against her will. Petitioner testified to the changes that needed to be made to make the declaration accurate, she made the changes necessary, and then she signed the declaration at the direction of the trial court. These circumstances do not support a conclusion that the execution of the declaration was involuntary under the Fifth Amendment.

The Court therefore finds and concludes that the State courts' rejection of this claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

3. *Petitioner's claim(s) that the "seizure" of the marked-up declaration violated her Fourth Amendment right against unreasonable search and seizure, the attorney-client privilege, and the Sixth Amendment*

Petitioner claims, as she did on direct appeal, that the trial court's "seizure" of her corrected declaration violated her Fourth Amendment right against unreasonable search and seizure. (*See* Pet. at 10, 17: Pet. Mem. at 52). In rejecting this claim, the California Court of Appeal reasoned that petitioner and her attorney had voluntarily offered the corrections to the declaration, and that petitioner had relied on the marked-up copy while testifying concerning the inaccuracies in the original declaration. The Court of Appeal also found that petitioner knew the corrections would be used at trial so they were not intended to be private. (*See* Lodgment No. 7 at 18–19).

As noted above, under *Stone,* 428 U.S. at 494, 96 S.Ct. 3037, where the "the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment

claim, a state prisoner may not be granted habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at trial." Here, although petitioner did not challenge the seizure of the allegedly illegally seized marked-up declaration at trial, she did challenge its admission on appeal. The issue was fully briefed, and as set forth above, the Court of Appeal gave careful consideration to the claim. The Court therefore finds this component of petitioner's claim barred under *Stone.*

■ Petitioner further claims that the "seizure" of the marked-up declaration constituted an "invasion" of the attorney-client privilege and led to a Sixth Amendment violation, citing *People v. Navarro,* 131 Cal.App.4th 1326, 1334, 32 Cal.Rptr.3d 706 (2005).[18] (*See* Pet. at 17; Pet. Mem. at 54). This Court, however, concurs with the California Court of Appeal that the corrections were made with the knowledge that they would be used at trial. Since the corrections that petitioner made were not intended to be confidential, the fact that the prosecutor was given access to them by the trial court did not constitute an invasion of the attorney-client privilege or result in a Sixth Amendment violation.

Accordingly, the Court finds and concludes that the State courts' rejection of this claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

**C.** ***Habeas relief is not warranted with respect to petitioner's ineffective assistance of counsel claims based on trial counsel's filing of the unsigned declaration, trial counsel's acquiescence to the trial court's instructions that petitioner testify regarding proposed changes and sign the declaration, and trial counsel's failure to object to the "seizure" of the marked-up declaration.***

In *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice."

■ "Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. To show "deficient performance," petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Further, petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Id.* The Supreme Court in *Strickland* recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreason-

---

**18.** *Navarro* relied on *Clutchette v. Rushen,* 770 F.2d 1469 (9th Cir.1985), which in turn cited *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) for the proposition that, "In some situations ... government in-

terference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights." *See Clutchette,* 770 F.2d at 1471.

able." *Id.* at 689. Accordingly, to over-turn the strong presumption of adequate assistance, petitioner must demonstrate that "the challenged action cannot reason-ably be considered sound trial strategy under the circumstances of the case." *Lord v. Wood,* 184 F.3d 1083, 1085 (9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000).

To meet his burden of showing the dis-tinctive kind of "prejudice" required by *Strickland,* petitioner must affirmatively "show that there is a reasonable probabili-ty that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable proba-bility is a probability sufficient to under-mine confidence in the outcome." *Strick-land,* 466 U.S. at 694, 104 S.Ct. 2052. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fun-damentally unfair").

It is unnecessary to address both *Strick-land* requirements if the petitioner makes an insufficient showing on one. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffective-ness claim on the ground of lack of suffi-cient prejudice, ... that course should be followed."); *see also Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir.2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other."); *Williams v. Calderon,* 52 F.3d 1465, 1470 n. 3 (9th Cir.1995), *cert. denied,* 516 U.S. 1124, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996).

*1. Trial counsel's filing of the un-signed declaration*

 Petitioner claims that trial counsel rendered ineffective assistance in filing the unsigned declaration. (*See* Pet. Mem. at 47–49, 54). In rejecting this ineffective assistance claim, the Court of Appeal did find that trial counsel's performance was deficient in filing the unsigned declaration. However, it found no prejudice since the trial court considered the unexecuted dec-laration—which was favorable to petition-er's motion, and in any event, rejected her motion to suppress. (*See* Lodgment No. 7 at 17–18).

The Court concurs with the Court of Appeal's reasoning and conclusion.[19] Ac-cordingly, the Court finds and concludes that the State courts' rejection of this claim did not involve an objectively unrea-sonable application of the *Strickland* stan-dard.

*2. Trial counsel's acquiescence to the trial court's instructions that peti-tioner testify regarding proposed changes and then sign the declara-tion*

 Petitioner further claims that trial counsel rendered ineffective assistance in acquiescing to the trial court's instructions that petitioner testify regarding proposed changes to the 10–month–old declaration and then sign the declaration. (*See* Pet. Mem. at 54–56). In rejecting this claim, the California Court of Appeal found that counsel's performance was not deficient. It reasoned in pertinent part:

"The record shows that, when [petition-er] signed the declarations, [petitioner's] attorney's main objective was to remedy the earlier oversight. He reasonably

---

**19.** While 'petitioner maintains that counsel's deficient performance in this first instance "set off a series of further errors" (*see* Pet. Mem. at 49), the Court declines to speculate regarding what would have transpired had counsel initially filed a properly executed dec-laration.

did not anticipate that [petitioner] would provide testimony contrary to the corrected declarations. [...] The record shows that [petitioner's] difficulty with the English language did not prevent her from examining the declarations and providing a truthful account of the events before signing them." (Lodgment No. 7 at 19–20).[20]

Again, the Court concurs with the Court of Appeal's reasoning and conclusion. While petitioner's counsel may not have had a legal obligation to have petitioner sign the declaration,[21] he may very well have felt that after having submitted the declaration in support of the motion to suppress, where it was treated as competent evidence, to now refuse to have the document executed (when it should have been executed in the first place) because the prosecution wanted to use it would have seemed not only disingenuous, but even a fraud on the court. The Court therefore finds and concludes that the State courts' rejection of this claim did not involve an objectively unreasonable application of the *Strickland* standard.

### 3. *Trial counsel's failure to object to the "seizure" of the marked-up declaration*

■ Petitioner also claims that trial counsel rendered ineffective assistance in failing to object to the "seizure" of the marked-up declaration. (*See* Pet. Mem. at 54–56). Although the Court of Appeal did not expressly address this claim, the Court finds no ineffective assistance in this regard. The Court already has found that the notes were not intended to be confidential and were not privileged. Further,

petitioner was holding and referring to the marked-up declaration while she testified as though refreshing her recollection. Documents used to refresh a witness's recollection during testimony or prior thereto are subject to production upon the request of the adverse party. *See* Cal. Evid.Code § 771. Petitioner's failure to establish the requisite deficient performance with respect to this ineffective assistance claim renders it unnecessary to consider the prejudice issue. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

### D. *Habeas relief is warranted with respect to petitioner's ineffective assistance of counsel claim based on trial counsel's failure to object to the prosecution's use of the declarations to impeach petitioner.*

Petitioner also claims that trial counsel rendered ineffective assistance in failing to object to the prosecution's use of the declarations to impeach petitioner. (*See* Pet. Mem. at 54–55). In rejecting this claim, the California Court of Appeal found that counsel did render ineffective assistance in this regard, reasoning that petitioner was subjected to a "barrage" of questions concerning the inconsistencies in the different declarations and that although the trial court had ruled that the original declaration should not be referenced, the prosecutor nonetheless referred to it without defense objection. The Court of Appeal concluded, however, that petitioner had failed to show a reasonable probability that a more favorable outcome would have resulted absent counsel's deficient performance. It reasoned that the

---

**20.** As previously noted, the Court's review of the reporter's transcript does not substantiate that petitioner executed two declarations.

**21.** The unsigned declaration did not invalidate the court's earlier ruling regarding the motion to suppress. *See People ex rel. Dept. of*

*Public Works v. Alexander,* 212 Cal.App. 2d 84, 98, 27 Cal.Rptr. 720 (1963) ("evidence which is technically incompetent and immaterial under the exclusionary rules, if offered and received without proper objection or motion to strike, may be considered in support of a judgment").

chronology of events was not a significant part of the prosecution's case, and that while petitioner's inconsistent statements were used to portray defendant as an unreliable witness, her unreliability was "amply demonstrated by her own inability to provide a consistent version of the events." Thus, "the damage to her credibility was primarily of her own doing." It also reasoned that "ample" evidence at trial showed that petitioner was responsible for Dana's injuries. (*See* Lodgment No. 7 at 21–22).

 The issue here, then, is whether the State court's determination that petitioner failed to make the requisite showing of prejudice was objectively unreasonable. For the reasons discussed below, the Court finds and concludes that it was.

### 1. *There was not ample evidence of petitioner's guilt.*

The Court of Appeal found that the evidence showed: (1) Dana had been the victim of prior abuse and petitioner admitted that she was the only member of the household who hit Dana and disciplined her, and the witnesses confirmed this; (2) petitioner had admitted to throwing her on the pillow and kicking her diaper (which she initially denied), and the fatal injuries could not have been caused by Dana or a small child (e.g., her brother); and (3) there was no evidence Noe Lugo had hit Dana. (*See* Lodgment No. 7 at 22).

However, that petitioner stated she was the only one who disciplined or hit the children and that other (initially equally suspicious apartment inhabitants) confirmed this did not weigh heavily in favor of petitioner's guilt. Petitioner's "admission" was not dispositive proof that she *was* the only one who disciplined or hit the children—petitioner could not have known what others were doing with her children while she was not present, and there was evidence that others in the apartment had

been present with the children *without* petitioner. (*See* 2 RT 506, 513, 517–18, 530; 2 CT 523, 526–27, 538).

Moreover, contrary to the Court of Appeal's finding that there was no evidence that Lugo had hit Dana, Lugo had admitted during his interview with Ortiz that *he had* "once" hit Dana (*see* 2 CT 546), showing both that petitioner was *not the only one* who hit or disciplined the children, and surely not making it a foregone conclusion that petitioner was responsible for Dana's healing injuries. Both of these points are underscored by the testimony of Sergio Lopez, which was not even acknowledged by the Court of Appeal.

Lopez was a friend of petitioner and Lugo's who testified on behalf of petitioner that he stopped by the apartment around 5:00 p.m. on the day Dana died to pick up a firearm from Lugo that he had offered to disassemble and clean. Lugo's parents and Lugo were there with Dana. Lugo was in the living room with Dana when Lopez exited the apartment. As Lopez left, he heard a "thump like when you hit someone" and Dana started crying very hard. (*See* 3 RT 672–73). He further testified that he had seen Lugo with Dana eight days before she died. Lugo was "holding" Dana to him with his arm around the right side of her rib cage while Dana was crying loudly. Lopez told Lugo to "leave her alone because he was really harming her." He testified that he left right after he told Lugo to stop because "he wanted to tell the people close by to take the child away from him." One day after that, Lugo's brother told Lopez that if he "talked about that," he was "going to be in trouble." (*See* 3 RT 675–77). The coroner testified that Dana had healing rib fractures on both her right and left side, and estimated that those injuries were inflicted three to seven days before death. (*See* 2 RT 314–15, 318–19).

Finally, there was no physical evidence or eyewitness testimony linking petitioner to Dana's injuries; the only evidence was petitioner's admissions and any inferences that could be drawn therefrom. However, the only admission of physical force made by petitioner that could have been construed as even remotely related to Dana's injuries was that petitioner had grabbed Dana's arm and thrown or "toss[ed]" her to the pillow when she would not go to sleep.[22] The coroner testified, however, that the fatal injuries resulted from a compression of eight by five inches of Dana's abdomen that broke several ribs and pushed her organs against the backbone. The injuries could have been caused by one or two strong blows or by pushing the foot down and squeezing the ribs against the floor, but picking up a 16–month–old of Dana's size and throwing her to the ground would not have caused the fatal injuries. (*See* 2 RT 338, 348–49, 352). That petitioner had also admitted using her foot on Dana's diaper was not significant to show she killed Dana in light of the fact that it was not clear when this had happened, there was no evidence of any injury to Dana's bottom, and no one suggested this was the cause of or even related to the healing or fatal injuries. Thus, contrary to the Court of Appeal's characterization, the evidence of petitioner's guilt was far from "ample."

## 2. *Petitioner's credibility was critical to her guilt.*

It is true that the chronology of events was not a significant part of the prosecution's case. However, precisely because the evidence against petitioner was not

ample and because petitioner's own admissions and denials constituted the bulk of the prosecution's case-in-chief,[23] petitioner's credibility was critical to her guilt. The importance of petitioner's credibility is demonstrated by the great lengths to which the prosecution went during cross-examination to impeach it. The Court of Appeal itself noted that "most of the prosecutor's lengthy cross-examination was based on the discrepancies in the declarations" and that the prosecutor used petitioner's inconsistent statements to portray her as an "unreliable witness." (*See* Lodgment No. 7 at 20–21).

Petitioner denied hitting Dana in the stomach or kicking her anywhere, though she admitted using her foot on Dana's diaper. If the jury credited these denials, it could not have found her guilty on the evidence presented. In convicting her, the jury implicitly found petitioner's denial of culpability incredible. The prosecutor achieved this jury finding by seizing on the inconsistencies in the declarations to attack petitioner's credibility, making her out to be totally inconsistent on virtually every point and therefore wholly incredible. The Court of Appeal noted that petitioner was subjected to a "barrage of questions" on cross-examination regarding the inconsistencies in her declaration, but cited only one specific example of the prosecutor's objectionable cross-examination on the declarations when the record is in fact replete with examples. The following are just a few examples of the prosecutor's impeachment on the declarations, replete with improper references to the original declaration, misstatements of the evidence,

---

**22.** The trial court itself acknowledged at sentencing that petitioner's "position ha[d] been heartfelt and ha[d] been consistent throughout ... [that she had] always said that [she] did not take the life of [her] daughter and [she] continue[d] to hold to that position." (*See* 4 RT 947).

**23.** The prosecutor stated in closing that the deceased body itself, the size and location of the injuries, and the fact that it was a homicide were "direct evidence" in the case. (*See* 4 RT 836).

**1176**

and inflation of the contradictions. Trial counsel objected to none of them.

The Court of Appeal noted that regarding when petitioner took a cool bath with her son in the bathroom, the prosecutor asked, "[s]o which is it, is it 8:00 p.m. or 6:00 p.m. or 10:00 p.m., as you wrote last night or 9:00 to 9:30 as you wrote today?" (*See* 2 RT 540). In fact, there was never any statement or testimony regarding a bath at 6:00 p.m. and only the *original* declaration ever mentioned an 8:00 p.m. bath with petitioner's son. Moreover, petitioner's penciled-in correction was that the bath took place "before 10:00 p.m." and the corrected (signed) declaration reflected the bath time "around 9:00–9:30 p.m." (*see* 1 CT 108)—which, while not the same, is not inconsistent either. As the Court of Appeal found, the prosecutor improperly referenced the original declaration and she "inflated the contradiction" in times, giving defense counsel "no conceivable reason" for failing to object. (*See* Lodgment No. 7 at 21).

Other instances of objectionable questions regarding the declarations abound. The prosecutor verified with petitioner that they had been talking about different declarations—one she "wrote" on Tuesday evening and one signed "yesterday." She then stated "these were all from a declaration that was filed with the court in June of last year? ... [but] you did not make any corrections until Tuesday evening; correct?" (*See* 3 RT 549). This clearly implied that petitioner had had an opportunity to make changes for nearly a year but had only made changes mid-trial, two nights before she testified. Trial counsel did not object. Following this, the prosecutor referred to the original declaration again, "[i]n dealing with paragraph 12, it reads, 'While I was taking a bath at approximately 8:30 p.m., Noe came in with my 16 month old daughter, Dana, and she was very sick, is that correct?'" (*See* 3 RT 550). The prosecutor then pointed out petitioner's amendment of the 8:30 time to "10:10 p.m." on Tuesday night and "about 10:00 p.m." on her corrected declaration. (*See* 3 RT 550). While the prosecutor was free to argue that "about 10:00 p.m." and "10:10 p.m." were inconsistent, she was not free to impute to petitioner the original 8:30 p.m. bath-time set forth in the original declaration and again, thereby, inflate the inconsistency.

Regarding paragraph 30, the prosecutor asked petitioner about a change she had made (from the *original* declaration) on Tuesday night. In the second sentence, petitioner had added the word "thought" so that the sentence read, "At one point after about an hour, Detective Ortiz told me that if I just admitted that I pushed my daughter down on the bed to go to sleep ... I *thought* I would immediately be allowed to go home." (*See* 3 RT 588–89). The prosecutor then inquired when Ortiz had told petitioner to just say she pushed her daughter down to go to sleep. Petitioner responded that it was her impression that if she stated it was an accident, she would get to go home. The prosecutor then stated, "So when you signed that declaration under penalty of perjury that at one point after about an hour, Detective Ortiz told me that if I just admitted that I pushed my daughter down on the bed to go to sleep, I thought I would immediately be allowed to go home[,][s]he never said anything like that?" (*See* 3 RT 589–90).[24] However, petitioner *did not* sign the original declaration under penalty of perjury, which the prosecutor *knew*. The prosecutor continued to hammer away at petitioner, accusing her of lying and insinuating that peti-

24. Petitioner, apparently missing the reference to the fact that she had signed the decla- ration, admitted "no," and that the statement was incorrect. (*See* 3 RT 590).

tioner had not made changes last June but had only made changes after the videotape showed her statements were not correct. (*See* 3 RT 572–74 ("You needed to change some of the times on that declaration because, although, they sounded good last June, they didn't match your videotape; isn't that correct?")).

That the prosecutor viewed petitioner's credibility as central and went to great lengths to impeach it is beyond dispute. The importance of petitioner's credibility also is evidenced by the prosecutor's closing argument, wherein she relied heavily on the inconsistencies in the declarations to argue petitioner's unreliability. Although the prosecutor herself admitted that she had "beat a dead horse" regarding the inconsistencies in the declarations and would "probably ... beat it a little bit more with the declaration [in closing]," she maintained that the inconsistencies showed petitioner was lying to deflect responsibility. The prosecutor argued that by the time of the interview with Ortiz, petitioner had not yet had "an opportunity to figure out what to lie about ... had [not had] an opportunity to listen to the videotape and change declarations." (*See* 4 RT 814, 818). Petitioner later had "a chance to figure out how to change the facts to make it look less bad," according to the prosecutor. (*See* 4 RT 818). The prosecutor argued that she was "lying about timing" but that "the times are important" because petitioner "ha[d] to be away from the child, so [she] couldn't inflict the injuries" and she

changed the declarations to "fit the actual facts." (*See* 4 RT 819, 838, 845, 846). She argued that petitioner had been caught in the series of lies intended to cover up her responsibility for Dana's death, and asserted that petitioner was a "person who we can't really trust." (*See* 4 RT 845–48).

Even without the improper impeachment, there were inconsistencies available to the prosecution for impeachment, and in fact, the prosecutor seized upon them.[25] However, none of the inconsistencies that the prosecutor would have been left to argue absent the improper impeachment suggested that petitioner was lying to cover up her own wrong-doing. Simply, they did not eliminate petitioner's opportunity to have caused the injuries in the critical four to twelve hour window when the fatal injuries were inflicted—like the prosecutor argued her inconsistent declarations did. (*See* 3 RT 845). Nor were they so great that they would have left the jury with the impression of total dishonesty that followed the improper cross-examination that did occur. In short, absent the prosecutor's objectionable impeachment with the declarations, petitioner's credibility would not have been annihilated.

### 3. *The jury struggled with the evidence.*

The jury's struggles during deliberations show that the evidence was hardly overwhelming, but the California Court of Appeal did not even acknowledge the jury's lengthy deliberations and near-dead-

---

**25.** For example, petitioner admitted that she had failed to correct the statement in the declarations that she was at the doctor's from 2:00–5:30 p.m., though she had signed it under penalty of perjury. She explained that "it went by" her; in fact she had done other things before the appointment, had only been at the doctor's appointment from about 4:00–4:30 p.m., and had gotten a prescription to fill afterwards. (*See* 2 RT 512–13, 537–38).

Petitioner also struggled to explain what had happened to the "23" or "53" minutes when she estimated that she had taken her bath around 9:00 to 9:30 p.m. (marked up declaration) and 10:00 p.m. (corrected declaration), but had testified that she was only in the bath for some seven minutes before Lugo brought Dana into the bathroom saying she was ill. (*See* 3 RT 552–53). She repeatedly stated that she did not have a watch and could only estimate the timing of events.

lock. On the first full day of deliberations, the jury requested transcripts of petitioner's and Lugo's interviews with Ortiz, one copy for each juror. (*See* 4 RT 861). On the second day, it viewed the videotape of Noe's interview. (*See* 2 CT 379). At 2:30 p.m. on the fourth day, it requested Lucy Lugo's interview with Ortiz and petitioner's declaration but was informed by the court that neither Lucy's interview nor the declaration had been admitted into evidence and therefore would not be produced. (*See* 2 CT 384; 4 RT 868). At 3:50 p.m. on the fourth day, the jury reported that it was deadlocked on the murder count. After a conference with the court, deliberations continued. (*See* 2 CT 383, 385, 390; 2 RT 870–79). On the fifth day, the jury inquired " 'please, please, please' provide further definition, explanation, or clarification' " of "reasonable doubt" and "beyond a reasonable doubt" and asked for instruction on "[h]ow to treat lack of evidence." (*See* 2 CT 387). On the sixth day, it asked for a readback of petitioner's testimony and Dr. Trenkle's testimony. (*See* 2 CT 389, 394, 4 RT 894–99). On the seventh day, it asked about the instructions on second-degree murder and alternate theories of murder. (*See* 2 CT 392–93; 4 RT 901–03).

That this case was not "open and shut," that the jury itself struggled with a "lack of evidence," and that petitioner's credibility was key is evidenced by the length of deliberations and the jury's multiple inquiries—in particular, their requests for petitioner's declaration and a readback of her testimony. This, in turn, shows that the damage to petitioner's credibility during the improper impeachment "tipped the scales against" her. *See Kennedy v. Lockyer,* 379 F.3d 1041, 1056, n. 18 (9th Cir. 2004) (granting habeas relief, and noting that the jury's lengthy three-day deliberations and its struggle with evidence that was not overwhelming made it difficult to conclude that the prejudicial gang testimony was not a substantial factor that tipped the scales against the petitioner), *cert. denied,* 544 U.S. 992, 125 S.Ct. 1823, 161 L.Ed.2d 755 (2005); *United States v. Velarde–Gomez,* 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (stating that "longer jury deliberations 'weigh against a finding of harmless error [because] lengthy deliberations suggest a difficult case' " and holding that admission of possibly prejudicial evidence required reversal of defendant's conviction where the four-day jury deliberations were "relatively lengthy" for a two-count drug case).

### 4. *Conclusion*

In conclusion, the Court finds and concludes that the State courts' determination that petitioner was not prejudiced by her counsel's deficient performance in failing to object to the prosecution's use of the declarations to impeach petitioner was objectively unreasonable. The Court therefore has concluded that habeas relief is warranted with respect to this ineffective assistance claim.

### RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered granting a conditional writ of habeas corpus as follows: Unless petitioner is brought to retrial within sixty (60) days of the date the Judgment herein becomes final (plus any additional delay authorized under State law), respondent shall discharge petitioner from all adverse consequences of her conviction in San Bernardino County Superior Court Case No. FVA015633.